**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| NEAL MORRIS,<br><br>                                   Plaintiff,<br><br>                    v.<br><br>The CITY OF NEW ORLEANS,<br><br>                                   Defendant. | CIVIL ACTION NO.: 18-02624<br><br>JUDGE: FELDMAN<br><br>MAGISTRATE JUDGE: WILKINSON |

**MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff respectfully submits this memorandum of law in support of his Motion for Summary Judgment.

**INTRODUCTION**

This lawsuit challenges the constitutionality of the City of New Orleans' (the "City") regulation of private murals—artwork installed or created on private property. The City requires permits for all murals throughout the municipality,[1] regardless of the property's location, the age of the property, and whether the property is residential or commercial. Permit applications cost at least $500 per mural, and permits must be obtained before murals can be created, under penalty of fines and imprisonment. Plaintiff has challenged the City's murals-permit scheme on several

---

[1] Murals are currently not permitted in the French Quarter.

grounds, including due process and equal protection,[2] but his primary argument is that it violates a fundamental right to freedom of expression.

Regardless of the City's motivation for requiring permits for murals, its murals-permit scheme amounts to government regulation of private art, which is offensive to the creative culture of New Orleans as well as the First Amendment to the United States Constitution. The City is known for fostering a vibrant, innovative arts community, but its murals-permit scheme has the opposite effect of hindering, inhibiting, and deterring free expression.

As explained more fully below, the City's murals-permit scheme equates to a prior restraint and a content-based restriction on speech. It is not a reasonable time, place, and manner restriction, and it is not narrowly tailored to serve a significant government interest. For these reasons, the City's murals regulations cannot stand.

## FACTUAL BACKGROUND

Pursuant to Local Rule 56.1, Plaintiff has submitted an attached Statement of Material Facts, incorporated herein by reference.  Defendant City has never filed an Answer in this case, making it difficult to discern whether the City disputes any of the facts recited in the Complaint. The City's Answer was due on April 4, 2018. Rec. Doc. 14. Plaintiff submits that no material facts are in dispute in this case; it involves a purely legal dispute.

Plaintiff filed his Complaint more than a year ago, on March 13, 2018. The Court is familiar with the procedural history of this case, but recent developments in the City's murals-permit scheme bear emphasis because they are particularly relevant to the instant motion. On October 18, 2018, the Court denied in part, and granted in part, the City's Motion to Dismiss. Rec. Doc. 59.

---

[2] Plaintiff's equal protection claim was dismissed, Rec. Doc. 59, and it is not argued in this motion.

On Dec. 12, 2018, the City filed a Motion to Stay the Case, Rec. Doc. 65, arguing that the City had undertaken revisions to its Comprehensive Zoning Ordinance (the "CZO") that the City believed would "change the course of this litigation, including mooting the case." Rec. Doc. 65-1, at p. 1. The Court held a status conference on the following day, Dec. 13, 2018, and denied the motion as moot. Rec. Doc. 67.

However, the Court was "convinced that a brief delay [was] warranted to give the City an opportunity to remedy issues it faces in this lawsuit." Rec. Doc.  67. Consequently, the Court admonished the City to act quickly and efficiently "in presenting a new Ordinance which the City feels addresses the issues in this case." Rec. Doc. 67. The City has now passed the referenced ordinance.

On January 22, 2019, the City Planning Commission unanimously approved a text amendment to the CZO regarding the City's murals-permit scheme. Specifically, the Commission approved changes to the definitions of "sign" and "mural" in CZO § 26.6 as well as changes to the permit application and approval process in CZO §§ 21.6.V. On March 14, 2019, the City Council unanimously approved the proposed amendment, passing Motion No. M-18-511. On April 30, 2019, Mayor Latoya Cantrell approved the measure, making it effective immediately. *See* Exhibit A. Plaintiff submits his Motion for Summary Judgment as the constitutionality of the City's murals-permit scheme is now ripe for the Court's consideration. The relevant changes to the CZO are detailed below. Deletions to the CZO are represented by strikethrough text, and additions are shown with new language in underlined, bold text.

### Article 26.6, Definitions

Mural: A work of art painted or otherwise applied to or affixed to an exterior surface that does not include any on- or off-premise commercial advertising **or does not**

**otherwise meet the definition of a sign as set forth in Article 26 of the Comprehensive Zoning Ordinance**.

Sign: Any structure, display, device, or inscription which is located upon, attached to, or painted or represented on any land, structure, on the outside or inside of a window, or on an awning, canopy, marquee, or similar structure, and which ~~displays or includes any numeral, letter work, model, banner, emblem, insignia, symbol, device, light, trademark, or other representation used as, or in the nature of, an announcement, advertisement, attention arrester, direction, warning, or designation of any person, firm, group, organization, place, community, product, service, business, profession, enterprise, or industry~~ **proposes a commercial or economic transaction through advertisement; promotion; the direction of attention to any commercial establishment, product, service, industry, business, profession, enterprise, or activity for a commercial purpose; or proposes such a transaction through other means.**

Article 21.6.V.1, Application

a. No person, firm, or corporation may commence a mural installation on a site without ~~development plan and design review approval by the Executive Director of the City Planning Commission and the Design Advisory Committee in accordance with Section 4.5. A separate application is required for each mural on a site~~ **the submittal of a mural permit application and subsequent mural permit issuance by the Department of Safety and Permits**.

Article 21.6.V.2, Required Submittals

c. General ~~drawing~~ **sketch** and written description of the type of mural (painted, mosaic, etc.) **specifically identifying any commercial elements. This requirement shall solely serve to allow the City to determine whether the proposal is more properly permitted as a sign, as defined in Article 26 of the Comprehensive Zoning Ordinance. The Department of Safety and Permits shall make this determination within 15 days of submittal.**

## ARGUMENT

## I.   LEGAL STANDARDS

### A.  Summary Judgment

Under Rule 56(a), summary judgment is generally appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case no material facts are in dispute. The language of the City's CZO speaks for itself.

### B.  Facial Challenge

To prevail in a First Amendment facial challenge to an ordinance, Plaintiff must establish that "a substantial number of applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (citing *U.S. v. Stevens*, 559 U.S. 460, 473 (2010)).

### C.  Defendant Bears the Burden of Proof

When fundamental First Amendment rights are at stake, the U.S. Supreme Court has found that the government, not the Plaintiff, must bear the burden of proving not only a compelling government interest, but also that less restrictive means are inadequate to serve that interest. *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004); *Gonzales v. O Centro Espirta Beneficente Unio do Vegtal*, 546 U.S. 418, 429 (2006). To guard against the threat of government censorship of First Amendment rights, the Constitution "demands that content-based restrictions on speech be presumed invalid," and that the Government bear the burden of showing their constitutionality. *Ashcroft*, 542 U.S. at 660 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)); *U.S. v. Playboy Entertainment Group*, 529 U.S. 803, 817 (2000).

### II.     THE CITY'S SCHEME VIOLATES THE FIRST AMENDMENT

The U.S. Constitution commands that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The First Amendment is applicable to the states by

virtue of the Fourteenth Amendment. *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947). Municipal ordinances adopted under state authority constitute state action and are within the ambit of the First and Fourteenth Amendments. *Wexler v. City of New Orleans*, 267 F. Supp. 2d 559, 564 (E.D. La. 2003). As a general matter, the First Amendment "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *King v. Caldwell ex rel. La. AG*, 21 F. Supp. 3d 651, 656 (E.D. La. 2014) (citing *U.S. v. Stevens*, 559 U.S. 460, 468 (2010)). A statute that regulates based on subject matter or content is "presumptively invalid" and subject to strict scrutiny. *Id*.

Here, the City's murals-permit scheme is unconstitutional for several reasons. First, the scheme is a prior restraint, requiring every person who wants to have a mural on property in New Orleans to obtain the City's *prior* approval. Second, the scheme is a content-based restriction on expression. The regulation is content based on its face, its purpose and justification are content based, and its enforcement is content based. Finally, the City's scheme violates Plaintiff's due process rights because its standards are so vague that they are effectively meaningless.

### A. Murals are a protected form of expression

Murals are a form of artistic expression protected by the First Amendment. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602 (1998) ("It goes without saying that artistic expression lies within … First Amendment protection."). *See also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995) (noting examples of painting are "unquestionably shielded")*; Kaplan v. California*, 413 U.S. 115, 119-20 (1973) ("As with pictures, films, paintings, drawings, and engravings, both oral utterance and the printed word have First Amendment protection[.]"); *Massachusetts v. Oakes*, 491 U.S. 576 (1989)

("Photography, painting, and other two-dimensional forms of artistic reproduction … are plainly expressive activities that ordinarily qualify for First Amendment protection.").

The constitutional protection of artistic works turns "on their expressive character, which falls within a spectrum of protected 'speech' extending outward from the core of overtly political declarations. Put differently, art is entitled to full protection because our 'cultural life,' just like our native politics, 'rest[s] upon [the] ideal' of government viewpoint neutrality." *Finley*, 524 U.S. at 602-03 (citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994)).

### B.  The City's scheme is a prior restraint

The City requires every person in New Orleans who wants to paint a mural, even on his own property, to pay the government $500 and to have the City approve the artwork in advance. Specifically, the amended CZO provides that no person "may commence a mural installation on a site without the submittal of a mural permit application and subsequent mural permit issuance by the Department of Safety and Permits." CZO § 21.6.V.1(a). Because the City requires property owners to obtain a permit for a mural *before* the mural can be painted, the murals-permit scheme is a prior restraint, which triggers strict scrutiny analysis by this Court. *See Avis Rent A Car Sys v. Aguilar* 529 U.S. 11388, 1142 (2000) (citation omitted) (noting that injunctions against speech are evaluated as prior restraints, which entails "the strictest scrutiny known to our First Amendment jurisprudence."); *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 472 (5th Cir. 2016) (citation omitted).

Prior restraints on speech "are the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Any system of prior restraints of expression "bears a heavy presumption against its constitutional validity." *N.Y. Times Co. v. U.S.*, 403 U.S. 713, 714 (1971).

The murals-permit scheme equates to requiring people to get government permission before they can express themselves. "It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition." *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002).

### 1. The scheme gives officials unbridled discretion

Simply the fact that the mural approval process operates to require government pre-approval of protected speech is enough to trigger strict scrutiny analysis. However, here the ordinance suffers additional constitutional flaws, as it gives unfettered discretion to City employees as to whether to approve or deny a permit. As this Court noted, "a scheme that places 'unbridled discretion in the hands of a governmental official or agency constitutes a prior restraint and may result in censorship.'" Rec. Doc. 59 at p. 24 (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990)).

Here, the City has unbridled discretion to issue or deny a permit, and the approval process lacks adequate procedural safeguards to ensure its constitutionality. The CZO does not specify or enumerate the reasons for denial of a mural permit, nor does it provide any standards relevant to the composition of an artistic mural. *See* CZO § 21.6.V.3, "Standards."

### 2. Vague standards foster officials' discretion

#### a. The Safety and Permits Department has unbridled discretion

As revised, the CZO defines a mural as "a work of art" that doesn't include "commercial advertising" and doesn't meet the definition of a sign. CZO § 26.6. Likewise, the murals "standards" section provides that murals "are considered public art," that are not permitted to "advertise any product, service or brand … non-commercial messages are permitted." However, "work of art" is undefined; therefore, what constitutes "art" is itself a subjective determination left to the discretion of City officials.

Additionally, "commercial advertising" is undefined. The CZO defines "sign," for example, as a painted display that "proposes a commercial or economic transaction through advertisement; promotion; the direction of attention to any commercial establishment, product, service, industry, business, profession, enterprise, or activity for a commercial purpose; or proposes such a transaction through other means." CZO § 26.6. Although this definition of "sign" appears to describe commercial speech, the "commercial advertising" proscribed in murals is ambiguous, and the "sign" definition has no other application.

Even when the definitions of sign and mural are considered *in pari materia*, it is unclear what commercial "messages" or "advertisement" are prohibited in a mural. To illustrate this ambiguity, consider a mural proposed by a New Orleanian who owns a building and wants to paint a tribute to the City on an exterior wall. The artist paints a cityscape and incorporates various tropes of the City's culture, including beignets, a Saints helmet, Mr. Bingle (the mascot of the defunct department store Maison Blanche), the distinctive purple logo of defunct drug store chain K&B (Katz and Besthoff), and a bottle of Tabasco®. All of these images may be considered advertisement or promotion, even though the artist contemplates no commercial transaction or

financial gain. Even an image of the City itself promotes the tourism industry. As this hypothetical demonstrates, the murals-permit scheme relies on subjective determinations that give unbridled discretion to the government, not only about what it considers commercial speech but also what it considers "art" as opposed to a "sign." It also illustrates another fatal flaw in the murals-permit scheme, which is the City's engagement in impermissible content review. *See* §II(C), *infra*.

Notably, the City's CZO revision apparently eliminates development plan and design review approval by the City Planning Commission and the Design Advisory Committee for murals-permit applications. However, even as revised, the murals-permit review implicitly requires some of the same aesthetic considerations by City officials. For example, the City previously stated in its briefing for this case that "[a]ll the standards listed in Section 21.6.V.3 establish that the principal justification for the mural standards provided in the CZO is to protect the historic fabric of the City of New Orleans." Rec. Doc. 38-1, at p. 8. Similarly, the City asserted that the CZO standards "preserve the historical architecture and character of our City[.]" Rec. Doc. 22, at p. 14. As a justification for its regulation of murals, the City previously cited its significant interest in assuring that murals occur "in a manner that is harmonious with surrounding properties and neighborhoods[.]" Rec. Doc. 38-1, at p. 12 (citing CZO §4.5(A)).

### b.   The HDLC also has unbridled discretion

The murals-permit scheme also gives unbridled discretion to the Historic District Landmarks Commission ("HDLC"), whose approval is required for murals in a local historic district or on a historically designated structure.  CZO § 21.6.V.1(b). If the HDLC "does not approve the mural, the mural is prohibited." *Id*. A "certificate of appropriateness" shows the HDLC has approved work proposed by an applicant. Municipal Code § 84-132. However, the HDLC's regulations do not specify any requirements or standards for murals. The HDLC shall consider

"the relationship of the exterior of the building concerned with all others in the district so as to avoid incongruity and promote harmony therewith." Municipal Code § 84-216(b). This standard is so vague as to give the HDLC unbridled discretion to disapprove murals permits.

Although murals are ostensibly no longer subject to review by the Design Advisory Committee, they are clearly still subject to considerations of "harmony" with neighboring properties through the HDLC approval process. (*See* Municipal Code § 84-216(b); the HDLC shall consider "the relationship of the exterior of the building concerned with all others in the district so as to avoid incongruity and promote harmony therewith.") Because the HDLC has no promulgated standards for murals, it must review them as part of a building's exterior, whose relationship with all others in the district it also must consider. Therefore, the HDLC must consider whether a mural is in "harmony" with surrounding properties. This is likewise an impermissibly vague standard that gives the government unbridled discretion.

### 3. The scheme lacks procedural safeguards

This Court has instructed that, in accordance with Supreme Court precedent, three procedural safeguards are required to ensure that prior restraints are constitutional. Rec. Doc. 59, at p. 24. Those safeguards specify that: 1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; 2) expeditious judicial review of that decision must be available; and 3) the censor must bear the burden of going to court to suppress the speech. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990) (citing *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965)).

Assuming arguendo that the *Freedman* factors must be met here, the City's scheme does not contain the necessary safeguards. The CZO as revised does not specify a timeline before judicial review, and the burden of appeal remains on the applicant. Although the Department of

11

Safety and Permits is required to determine whether a proposed mural is more properly permitted as a sign within 15 days, CZO § 21.6.V.2(c), the CZO does not specify any time limit for the Department of Safety and Permit's final approval.  This failure to provide this essential safeguard renders the ordinance's permit requirement unconstitutional. *See FW/PBS, Inc.*, 493 U.S. at 220.

Once an applicant appeals, the Board of Zoning Adjustments shall conduct a public hearing and make a final decision within 45 days. CZO § 4.8.D. An aggrieved party can appeal a Board of Zoning Adjustments to the Orleans Parish Civil District Court. CZO § 4.8.F. If the applicant requires HDLC approval, a decision is mandated within 45 days. Municipal Code § 84-78(d). An appeal of the HDLC's decision must be considered within another 45 days. Municipal Code § 84-134(a). An aggrieved applicant can then file a civil suit "in a court of competent jurisdiction." Municipal Code § 84-134(b). Thus, a typical applicant whose mural permit is denied must wait 60 to 150 days or longer before he can seek judicial review.

Just as streets and sidewalks are prototypical examples of public fora, political speech related to current events is the prototypical example of protected speech. *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) (citing *Texas v. Johnson*, 491 U.S. 397, 411 (1989)). Residents must have the right to speak out on any issue of the day unfettered by protracted, bureaucratic regulation. To be effective, political commentary and calls to action must be timely. The waiting periods built into the City's murals-permit scheme can be used to completely silence speech with which the government—or an individual government official—disagrees. Because the delays compel silence through censorship, they are impermissibly unconstitutional. *See Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 802 (1988).

As the above provisions demonstrate, the City's murals-permit scheme imposes a prior restraint beyond a brief period of time before judicial review. *See Kinglsey Books, Inc. v. Brown*, 354 U.S. 436 (1957) (upholding injunctive procedure that postponed restraint until judicial determination two days after hearing to be held one day after joinder of issue). The Department of Safety and Permits' timeline is indefinite but may take at least 60 days before judicial review. HDLC approval can take 90 days before judicial review. This review is not expeditious, and the burden remains on the applicant to obtain judicial review. Consequently, the prior restraint poses a threat of censorship or suppressed expression.

Finally, this Court has directed that the above-cited *Freedman* safeguards do not apply to a content-neutral time, place, and manner regulation. Rec. Doc. 59, at p. 25. However, such regulation must "contain adequate safeguards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002). The City's murals-permit scheme is not a content-neutral regulation (*see* §II(C), *infra*), but even if it were, it does not contain adequate safeguards. Therefore, the City's murals-permit scheme is an unconstitutional prior restraint.

### C.  The City's scheme is a content-based restriction on expression

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citations omitted). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 2227 (citations omitted). A "speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter," consequently, even

13

a viewpoint-neutral law can be content-based. *Id.* at 2230. Strict scrutiny "applies either when a law is content based on its face or when the purpose and justification for the law are content based[.]" *Id.* at 2228.

In *Reed*, the town of Gilbert, Arizona, adopted a code governing the manners in which people could display outdoor signs. *Reed*, 135 S. Ct. at 2224. The Code categorized the signs based on the type of information the signs contained, and it imposed more stringent restrictions on "Temporary Directional Signs Relating to a Qualifying Event." *Id.* A church that advertised its services was cited with the Code's violation and challenged its constitutionality. *Id.* at 2225. The Ninth Circuit held that the provisions at issue were content-neutral, reasoning that an enforcement officer would not have to analyze the expressive content of a sign to classify it. *Id.* at 2226. The appellate court contended that the town did not regulate the sign "because it disagreed with the message conveyed" and its "interests in regulat[ing] temporary signs are unrelated to the content of the sign." *Id.*

The Supreme Court reversed, explaining that some facial distinctions based on message are more subtle, "defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 2227. Because the town of Gilbert defined its sign categories on the basis of their communicative content, its Code was content-based. *Id.*

Here, the City's murals-permit scheme is content-based in several proscribed respects. First, the scheme is content-based on its face. Second, the scheme's purpose and justification are content-based. Third, the scheme is content-based as applied.

### 1.   The scheme is facially content-based.

The murals-permit scheme applies to a particular type of expression—artwork—because of the ideas it expresses. In other words, it regulates murals because they are art. This is clear from a comparison between the definitions of "sign" and "mural." *See* CZO § 26.6.

### a.   Murals are subject to a regulatory framework based on their content

A mural is defined by reference to its content ("a work of art") which distinguishes it from a sign. In fact, the definition of "mural" explicitly references the definition of "sign," essentially saying that a mural is a work of art that "does not otherwise meet the definition of a sign[.]" This regime clearly regulates murals differently from signs based upon their communicative content, a facial distinction that violates the principles announced in *Reed*. Notably, the City's sign-regulation rubric contains multiple permit exemptions, in contrast to its mural regulations. For example, political and non-commercial signs are permitted in all districts and are exempt from permit requirements. CZO § 24.9.G. Other sign-permit exemptions include memorial plaques, flags, municipal signs, warning signs, and informational signs. CZO § 24.10.   No permit exemptions exist for murals.

The City's scheme effectively requires mural-permit applicants to prove that their proposed murals are not signs—and undergo content review costing $500 to prove that negative. One such example of the content-based nature of this process was uncovered in discovery. In early 2016, an applicant sought to install a mural called "The Life Cycle of Trash." Exhibit B. The City determined that the proposed mural was not "art" and denied a mural permit on that basis. Exhibit C. Although this occurred before the recent CZO amendments, the current law retains the same problematic structure in which City assesses whether a proposed image is art based upon the content submitted to it, and whether a commercial message is conveyed.

### b.  Murals are subject to content review

Moreover, the scheme explicitly requires the City to review the content of murals. One of the required submittals for a mural-permit application is a "general sketch and written description of the type of mural (painted, mosaic, etc.) specifically identifying any commercial elements." CZO § 21.6.V.2(c). The requirement of a sketch is an overt demonstration of content review. Notably, this regulation provides that it "shall solely serve to allow the City to determine whether the proposal is more properly permitted as a sign[.]" *Id*. Regardless of the regulation's self-avowed purpose, this statement proves that the City is engaged in content review of proposed murals.

Before the City revised its CZO, it required a "general drawing" of the proposed mural; as revised, the City requires a "general sketch." Both are objectionable for the same reason—that requiring a sketch or drawing allows the government to review the image(s) contained in the proposed mural. The City has not provided any legitimate justification for this requirement, nor can it. Other than for the purpose of engaging in unconstitutional content review, the City has no reason to require a sketch of the proposed mural.

The fact that the City explicitly defines murals based on their content, targeting and regulating them for that reason, subjects its scheme to strict scrutiny. Here, as in *Reed*, a facially viewpoint-neutral law is content-based.

### 2.  The scheme's purpose and justification are content-based.

The City's purpose and justification for its regulation of murals has shifted during the pendency of this case, but even its most recently articulated justification is content-based. The City previously stated that "[a]ll the standards listed in Section 21.6.V.3 establish that the principal justification for the mural standards provided in the CZO is to protect the historic fabric of the City of New Orleans." Rec. Doc. 38-1, at p. 8. The City also cited its significant interest in assuring that

murals occur "in a manner that is harmonious with surrounding properties and neighborhoods[.]" Rec. Doc. 38-1, at p. 12 (citing CZO §4.5(A)). As noted above, the City must engage in content review to determine whether murals are "harmonious" with surrounding properties. Moreover, the City also cited "aesthetics" as a significant interest, which likewise implies content review. ("Indeed, interests in aesthetics and traffic safety are the precise sort of interests which courts have previously found to be 'substantial.' Regulations that are necessary to serve aesthetics are recognized as legitimate interests for municipal governments." Rec. Doc. 38-1, at p. 10).

Putting aside its previously cited justifications, the City now asserts that it "has always intended to only regulate murals for commercial speech." Rec. Doc. 65-1 at p. 4. The CZO revision reflects the City's "narrow interests to only review content in order to determine whether a proposed mural contains commercial speech." *Id*.  This most recent pronouncement by the City readily admits to content review; it also cites a content-based justification. This justification is repeated in the CZO itself, which states that the required submission of a sketch and description "shall solely serve to allow the City to determine whether the proposal is more properly permitted as a sign[.]" CZO § 21.6.V.2(c). Because the CZO on its face provides a justification based on content review, and the City provides a content-based justification, the murals-permit scheme must be subject to strict scrutiny.

### 3.  The scheme is content-based as applied.

The City's enforcement of murals permits is content-based because it cites only murals about which it has received complaints. As Department of Safety and Permits Director Jared Munster stated in his affidavit, "In the vast majority of violation cases, mural or otherwise, the Department of Safety and Permits is a responsive agency rather than proactive." Rec. Doc. 22-1. The City took action against Plaintiff only after it received a complaint relative to the mural at

3521 S. Liberty Street. *Id*. The complaint described Plaintiff's mural as "disrespectful," asserted that it "crossed the line," and asked, "Do we have to have our 6 year old daughter and her 3 older sisters look at this [expletive] every day?" *See* Exhibit D, screenshots provided by City in discovery, and Exhibit E, City of New Orleans Response to Plaintiffs' Interrogatories, at p. 3 (Response to Interrogatory No. 3)

In response to an interrogatory propounded to the City regarding Mr. Munster's statement in his affidavit, the City said that it "does not actively enforce its mural laws unless it has received a complaint." *See* Exhibit E, City of New Orleans Response to Plaintiffs' Interrogatories, at p. 6 (Response to Interrogatory No. 7).

The City affirmed its complaint-based enforcement approach to murals during the deposition of New Orleans One Stop for Permits and Licenses Director Jennifer Cecil, who authored the notice of violation to Plaintiff for his mural at 3521 S. Liberty Street. Appearing as New Orleans' designated corporate deponent, Ms. Cecil testified that the City takes no enforcement action against unpermitted murals unless someone complains about them. *See* Exhibit F, transcript of Jennifer Cecil 30(b)(6) deposition, pp. 29-30.

As these statements demonstrate, the City's enforcement of its murals-permit scheme is content-based and operates as a "heckler's veto." It is irrelevant whether the City itself disagreed with message that a mural conveyed, disliked its images, or found its expressive content offensive. The fact that the City's enforcement action is dictated by residents' complaints effectively renders the City a censor. On behalf of residents who disagree with a particular message or piece of art, the City executes a "heckler's veto." If no one complains about a mural, it remains. Unpopular speech is silenced. *See Gregory v. City of Chicago*, 89 S. Ct. 946 (1969) (arresting peaceful protesters because of bystanders' unruly behavior amounts to heckler's veto); *Reno v. ACLU*, 521

U.S. 844, 880 (1997) (government regulations that permit a private actor to silence a speaker confer "broad powers of censorship, in the form of a 'heckler's veto,'" upon the opponent of speech).

When the City selectively enforces its scheme because a resident is offended by the message in a mural—as is the case here—the City's action becomes censorship. The constitutional right to free expression is infringed by a municipal ordinance which is construed as permitting a conviction for speech inviting public dispute. *See Terminello v. Chicago*, 337 U.S. 1, 5 (1949). For these reasons, the City's murals-permit scheme is unconstitutional as applied.

### D. The City's scheme does not withstand strict scrutiny

Because the City's murals-permit scheme is a prior restraint and a content-based restriction of speech, it may be justified only if it is narrowly tailored to serve a compelling government interest. *Reed*, 135 S. Ct. at 2226 (2015). It is not narrowly tailored, and it does not serve a compelling government interest. The City has offered different justifications for its scheme, but it has not met its burden to prove any of its purported interests in regulating murals is compelling.

### 1. The scheme is not narrowly tailored

As noted above, the City's murals-permit scheme has sweeping application; murals are not permitted at all in the French Quarter, but everywhere else in New Orleans, a permit is required. Therefore, any justification based on the "historic fabric" or "historic architecture" is demonstratively overbroad. Permits are required for brand-new buildings and antediluvian ones, regardless of their neighborhood or location. If the City's interest in regulating murals is based on the protection of historic structures, its regulation must be tailored to that purpose. *See City of New Orleans v. Clark*, 2017-1453 (La. 9/7/18), 251 So. 3d 1047, 1056 (finding citywide prohibition on outdoor sales of art, except in French Quarter, "overly broad and not narrowly tailored" to serve

the City's interest); *Acorn v. City of New Orleans,* 606 F. Supp. 16, 21–22 (E.D. La. 1984) (finding ban on solicitation for funds in all streets and on neutral grounds overbroad).

A law is overbroad if it does not "aim specifically at evils within the allowable area of control … but sweeps within its ambit other activities that constitute an exercise of First Amendment rights." *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 507 (5th Cir. 1981) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940)). If the City's murals-permit scheme aims to prevent damage to historic structures, its scheme is overly broad because it applies to all properties, whether they are historic or not.

Likewise, the City's murals-permit scheme does not serve its avowed interest in regulating commercial speech. If the City "has always intended to only regulate murals for commercial speech," Rec. Doc. 65-1 at p. 4, then the required submittals need not include: proof of ownership or written permission of the property owner; a building elevation drawn to scale; and a general sketch and written description of the type of mural identifying commercial elements. CZO § 21.6.V.2. A "general sketch" is not necessary to determine whether a mural is more properly permitted as a sign, as a sketch is compositional, involving graphical elements. A "written description" that identifies commercial elements would suffice. But if the only reason to regulate murals is to determine whether they should be regulated as signs, the narrowly tailored solution is not to regulate murals at all. If a person painted a mural that the City determined were a sign, that mural would be subject to existing sign regulations and require a permit as such, just as any sign erected without a permit would.

The mural permitting scheme does not further any government interest as the City portends to regulate only commercial signs. Forcing creators of artistic murals to pay $500 and ensure they are not "signs"—a costly review to prove a negative—serves no government interest whatsoever,

and certainly is not narrowly tailored, because the government already has a separate permitting scheme regulating signs. The City regulates murals that do not contain commercial speech for the purpose of regulating commercial speech, thus sweeping within its regulations' ambit protected expression.

### 2.   The scheme does not serve a compelling interest

As mentioned above, the City has cited several "interests" in regulating murals, including protecting the "historic fabric" of New Orleans, and preserving the "historical architecture and character of the City." The City has also stated that, through the CZO, it is "merely regulating the physical characteristics of murals in the City—not [their] content." Rec. Doc. 38-1 at p. 3. To the extent that the City seeks to ensure murals do not damage historical buildings, its murals-permit scheme is not narrowly tailored (*see* § II(D)(1), *supra*). More importantly, its requirement of a "sketch and general description" does not serve its purported interest.

Nine months after Plaintiff's Complaint was filed, the City declared *for the first time* that it "has always intended to only regulate murals for commercial speech." Rec. Doc. 65-1 at p. 4. This statement is belied by the numerous other justifications that the City previously offered, but it presumably represents the City's final justification for its amended murals regulations. The CZO revision reflects the City's "narrow interests to only review content in order to determine whether a proposed mural contains commercial speech." *Id*.  But the CZO does not otherwise indicate how it serves the City's purported interest in regulating commercial speech.

The City's sign regulations do not themselves contain restrictions on commercial speech or criteria for the use thereof. The purpose of the CZO's "signs" section is to establish controls governing "display, design, construction, installation, and maintenance" of signs. CZO § 24.1. The section does not otherwise govern the content of speech on signs. If, as the City's statement and

the CZO suggest, the only reason for regulating murals is to determine whether they contain commercial speech, that justification supports regulation of signs, not regulation of murals.

### 3. The City has not met its burden

Plaintiff submits that the City has not met its burden to show that its murals regulation is constitutional. More specifically, it has not met its burden to prove that its interest (in determining whether murals contain commercial speech) is compelling, much less that its interest justifies the restriction of its murals-permit scheme. "A governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). If, as the City now contends, it regulates murals only to regulate commercial speech, it has not explained what harms such regulation prevents, nor has it offered any evidence of such harms. Regardless, it fails to show why a less restrictive measure would not accomplish that goal. Because a mural under the CZO "does not include any on- or off-premise commercial advertising" or otherwise meet the definition of "sign," a mural *by definition* does not contain commercial speech. Consequently, the City has no justification for regulating murals.

## III.   THE CITY'S SCHEME VIOLATES DUE PROCESS

The City's murals-permit scheme violates Plaintiff's due process rights because it is void for vagueness. As this Court has noted, the Supreme Court has consistently held that it is "a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *City of Mesquite v. Alladin's Castle*, 455 U.S. 283, 289-90 (1982) (citation omitted). An ordinance also violates the Due Process Clause of the Fourteenth Amendment when its standards are "too vague to support the denial of an application for a license." *Id*. at 293.

The City's murals-permit scheme is vague in many respects, but several bear emphasis here. First, the CZO's definition of "mural" is itself impermissibly vague, referring only to a "work of art painted or otherwise applied to or affixed to an exterior surface." CZO § 26.6. The City apparently relies on permit applicants to determine for themselves whether paint applied to an exterior surface is "art," as no definition of that term is offered. New Orleans Director of One Stop for Permits and Licenses Jennifer Cecil could not define the term. Appearing as New Orleans' designated corporate deponent, Ms. Cecil testified that "the presentation of a permit request is an assertion that this is a work of art[.]" *See* Exhibit G, transcript of Jennifer Cecil 30(b)(6) deposition, at p. 37. "If you begin describing figurative painting or painting of words, we would suggest you have it reviewed[.]" *See* Exhibit H, transcript of Jennifer Cecil 30(b)(6) deposition, at pp. 41-42. In other words, whether using decorative elements and different colors amounts to "art" is a subjective determination.

The City has reserved to itself the question of whether a painting is art, which is demonstrated by the City's denial of a permit for the proposed mural titled "The Life of Litter." *See* Exhibit B. According to the City Planning Commission's preliminary staff report, the purpose of the proposed mural was to promote trash reduction. *See* Exhibit C, City Planning Commission staff report, at p. 2. The Design Advisory Committee determined the proposal could not be a mural "because it is not a work of art." *Id*. Likewise, Planning Commission staff determined the work "is not a mural and is an informational sign." *Id*. at p. 4. The City's denial of a mural permit for this proposal—based on the determination that the mural wasn't "art" but "informational"— emphasizes not only the subjective nature of the City's review but the vagueness of its regulatory scheme. Only the City knows whether a work is art or not, but it apparently believes art cannot be "informational"—a dubious requirement that does not exist in its regulations.

23

Likewise, the definition of a mural as art painted "on an exterior surface" is unclear. For example, an exterior surface might include a roof that is not visible to passersby; it may include the wall of a penthouse atop a skyscraper. It is unclear whether the requirement of a permit depends on the type of structure. For example, when a nonprofit group painted utility boxes at intersections around the City, the Director of Public Works complained that the murals were not permitted, but the City allowed the project to continue.[3] Asked whether a permit is required for a utility box, Ms. Cecil testified that the Department of Safety and Permits does not regulate rights-of-way; that falls "under the Department of Public Works." Exhibit I, transcript of Jennifer Cecil 30(b)(6) deposition, at p. 49. However, a permit was required to paint murals on concrete pillars under Interstate 10 along the Claiborne Avenue corridor. *Id*. at pp. 50-51.

Asked whether a permit would be required for the wall of a courtyard—an exterior wall that is invisible from the street—Ms. Cecil could not answer. "That is not a question that we have been asked," she testified:

> Typically, when we are asked such a question, the zoning official, as well as our attorney in the City Attorney's Office and the Director of Safety and Permits would meet to discuss the appropriate interpretation of exterior wall, and the Director of Safety and Permits would issue a zoning memoranda that would then be published on our website to clarify exterior wall because it may have a separate meaning in the CZO than it does in the building code.

Exhibit J, transcript of Jennifer Cecil 30(b)(6) deposition, at p. 45. As this corporate testimony shows, the definition of "exterior surface" is itself open to interpretation, and a property owner could not know whether a permit would be required for a painting he proposed on a table, a roof, a pool bottom, a cabana, or a patio.

---

[3] Ramon Antonio Vargas, *Group Behind New Orleans' electrical box paintings is taking its artwork to Kenner*, THE NEW ORLEANS ADVOCATE, Sept. 15, 2016, available at:
https://www.theadvocate.com/new_orleans/news/communities/east_jefferson/article_54048350-7b8e-11e6-a249-3f76d3a49922.html

Similarly, the CZO does not define "commercial elements," as explained above. A mural-permit applicant is required to submit a "sketch and written description" that specifically identifies "any commercial elements," but that term is vague. Finally, applicants who live in historic districts, or propose murals on historic properties, cannot ensure that "the relationship of the exterior of the building concerned with all others in the district" will "avoid incongruity and promote harmony therewith." Municipal Code § 84-216(b). For all of these reasons, a mural-permit applicant cannot know what is prohibited in his mural, and the CZO is too vague to support a permit denial on the aforementioned grounds. Consequently, the City's murals-permit scheme violates due process.

## **<u>CONCLUSION</u>**

WHEREFORE, Plaintiff prays that this Court grant his Motion for Summary Judgment for the reasons cited herein.

Respectfully submitted by:
/s/ *Bruce Hamilton*
Bruce Hamilton, La. Bar No. 33170
Katie Schwartzmann, La. Bar No. 30295
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email: bhamilton@laaclu.org
         kschwartzmann@laaclu.org

And

RONALD L. WILSON, La. Bar No. 13575
ACLU Foundation of Louisiana
COOPERATING ATTORNEY
701 Poydras Street – Suite 4100
New Orleans, Louisiana 70139
Telephone: (504) 525-4361
Facsimile: (504) 525-4380
Email: cabral2@aol.com

*Counsel for Plaintiff*

25