UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEAL MORRIS                                          CIVIL ACTION

V.                                                   NO. 18-2624

CITY OF NEW ORLEANS                                  SECTION "F"


ORDER AND REASONS

Before the Court is the plaintiff's motion for summary judgment that the City's murals-permit scheme is an unconstitutional prior restraint and content-based regulation of expression, in violation of the First Amendment, and is void for vagueness under the Fourteenth Amendment.  For the reasons that follow, the motion is GRANTED.

**Background**

This civil rights lawsuit challenges the constitutionality of the City's murals-permit scheme, which regulates the installation of artwork on all private property throughout the City of New Orleans.

Neal Morris lives in Orleans Parish.  He owns residential and commercial properties.  He is perhaps not a fan of President Donald Trump.  On November 4, 2017, Morris commissioned a local artist to paint a mural on a commercial property he owns at 3521 South Liberty Street.  The mural quotes a controversial comment made by

President Trump that had been recorded in a 2005 "Access Hollywood" segment; the mural replaces with pictograms two vulgar words used by Trump.

Just a few days after the mural was painted, a local news outlet publicized a story about the mural and noted that murals "are typically regulated by the Historic District Landmarks Commission and the City Council." The same day the news story was published, on November 8, 2017, the City of New Orleans Department of Safety and Permits sent Morris a letter advising him that the mural violated a zoning ordinance. Jennifer Cecil, the purported director of the City's "One Stop for Permits and Licenses," wrote that an inspection of the property on November 8 revealed a violation of Section 12.2.4(8) of the Comprehensive Zoning Ordinance, which, according to her letter, concerns "Prohibited Signs—Historic District." Ms. Cecil described the violation:

> The mural on the building on this property is
> not allowed in that the property is zoned
> residentially and murals shall not be
> permitted in any residentially zoned historic
> district.

Morris was instructed to remove the mural, and warned that his failure to do so by November 22, 2017 would

> cause the Department of Safety and Permits to
> initiate appropriate legal action to secure
> compliance. The penalty for failure to comply
> is a maximum fine or jail for each and every
> day the violation continues plus court cost as
> prescribed by law.

Ms. Cecil said Morris should contact her once the mural had been removed so that she could re-inspect the property.

Not to be outdone, Morris uncovered several stark inaccuracies in the November 8 letter: Section 12.2.4(8) does not in fact exist; there is no section titled "Prohibited Signs—Historic District" in the CZO; nor does the CZO contain a blanket prohibition on murals in residentially zoned historic districts. On November 17, 2017, Morris politely wrote to the City requesting clarification in light of the inaccuracies in Ms. Cecil's letter.[1] Impolitely, apparently the City did not respond.

Anxious about being prosecuted, Morris sued the City on March 13, 2018, alleging that the murals-permit scheme (Comprehensive Zoning Ordinance § 21.6.V *et seq.* and Municipal Code § 134-78A *et seq.*) violate his First and Fourteenth Amendment rights. His complaint alleges that: (1) the City's requirement that property owners obtain advance government approval before receiving a mural permit, or face criminal punishment, subjects him and other

---

[1] At the conclusion of his letter to the City, Morris wrote:

> Can you tell me whether my artwork is a mural or a sign under the CZO, and can you explain how this determination is made?
>
> Again, I am attempting to comply with the City's zoning regulations, but I cannot tell from the letter I received what the alleged zoning violation is. I would appreciate your clarification.

property owners to an unconstitutional prior restraint on speech where approval or denial of a permit is left to the unfettered discretion of City officials; (2) the City's murals-permit process is an unconstitutional, content-based restriction on speech insofar as an applicant must pay a $500 fee and must submit a drawing, which will be subject to the City's "acceptability" review before a mural is approved;[2] (3) the City's murals-permit process violates Morris' and other property owners' due process rights by subjecting their artistic expression to prior review, indefinite in duration, by unspecified officials using vague, overbroad, or nonexistent standards; and (4) the City engages in selective enforcement of its mural regulations in violation of the Equal Protection Clause.[3] Morris' complaint requests:

- A preliminary (and ultimately permanent) injunction barring the City from enforcing the murals-permit scheme, Comprehensive Zoning Ordinance §21.6.V et seq. and Municipal Code § 134-78A et seq.;

---

[2] Morris also complains that "signs" are subject to a different regulatory scheme, and that some signs are exempt from the permit requirements, whereas no murals are exempt from the permit requirement.

[3] For example, Morris singles out a mural by artist Yoko Ono, which was painted on November 15, 2017 on the Ogden Museum, without a permit and without being cited for a zoning violation for the mural. See Reed v. Town of Gilbert, 135 S. Ct. 2218, 2223 (2015) ("And on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner.").

- A declaratory judgment that the City's actions, policies, and procedures embodied in the murals-permit scheme are unconstitutional violations of the plaintiff's rights under the First Amendment, as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

- Reasonable attorney's fees, expenses, and costs under 42 U.S.C. § 1988.

In May of 2018, about two months after Morris filed suit, the New Orleans City Council enacted M.C.S., Ordinance No. 27783, which removed Sections 134-78A and 134-78B from the Municipal Code. As a result, the City's murals-permitting scheme was found only at CZO Section 21.6.V. In addition, the City agreed that it would not enforce its murals-permitting scheme against Mr. Morris for any existing or additional murals painted on his properties during the pendency of this lawsuit. In light of the City's non-enforcement pledge, this Court, in its May 31, 2018 Order and Reasons, denied as moot Mr. Morris' motion for preliminary injunctive relief.

Thereafter, the City moved to dismiss the plaintiff's complaint for failure to state a claim under Rule 12(b)(6). On October 18, 2018, the Court denied the City's motion as to all claims, except the plaintiff's "class of one" Equal Protection claim. Faced with this Court's unfavorable decision, the City

proceeded to amend its murals-permit scheme once again. Contending that it had undertaken revisions of the CZO that it believed would "change the course of this litigation, including mooting the case," the City moved to the stay these proceedings on December 12, 2018. The next day, the Court held a status conference and denied the City's motion to stay. However, the Court was "convinced that a brief delay [wa]s warranted to give the City an opportunity to remedy issues it faces in this lawsuit." Accordingly, the Court continued the pre-trial conference and trial dates and admonished the City "to act as efficiently and as quickly as possible . . . in presenting a new Ordinance which the City feels addresses the issues in this case."

The City has now passed the successor ordinance. On January 22, 2019, the City Planning Commission unanimously approved a text amendment to the City's murals-permit scheme, which modifies the definitions of "sign" and "mural" in CZO § 26.6 and alters the murals-permit application and approval process in CZO § 21.6.V. The City Council adopted the amendment on April 25, 2019, and the Mayor signed the measure into law on April 30, 2019. Most recently, on June 13, 2019, the City amended its mural regulations for a third time, reducing the permit fee from $500 to $50. As currently drafted, the CZO regulates murals as follows:[4]

---

[4] Deletions to the CZO are represented by strikethrough text, while new language is displayed in underlined and bold text.

**Article 26.6 DEFINITIONS**

**Mural**. A work of art painted or otherwise applied to or affixed to an exterior surface that does not include any on- or off-premise commercial advertising **or does not otherwise meet the definition of a sign as set forth in Article 26 of the Comprehensive Zoning Ordinance.**

**Sign**. Any structure, display, device, or inscription which is located upon, attached to, or painted or represented on any land, structure, on the outside or inside of a window, or on an awning, canopy, marquee, or similar structure, and which ~~displays or includes any numeral, letter work, model, banner, emblem, insignia, symbol, device, light, trademark, or other representation used as, or in the nature of, an announcement, advertisement, attention-arrester, direction, warning, or designation of any person, firm, group, organization, place, community, product, service, business, profession, enterprise, or industry~~ **proposes a commercial or economic transaction through advertisement; promotion; the direction of attention to any commercial establishment, product, service, industry, business, profession, enterprise, or activity for a commercial purpose; or proposes such a transaction through other means.**

**ARTICLE 21.6.V - MURALS**

**ARTICLE 21.6.V.1 – APPLICATION**

a. No person, firm, or corporation may commence a mural installation on a site without ~~development plan and design review approval by the Executive Director of the City Planning Commission and the Design Advisory Committee in accordance with Section 4.5. A separate application is required for each mural on a site~~ **the submittal of a mural permit application and subsequent mural permit issuance by the Department of Safety and Permits.**

b. Any structure within a local historic district or on a historically designated structure requires approval of the Historic District Landmarks Commission or Vieux Carré Commission prior to ~~review by the Design~~

7

~~Advisory Committee~~ **the issuance of the mural permit by the Department of Safety and Permits.** If the Historic District Landmarks Commission or Vieux Carré Commission does not approve the mural, the mural is prohibited.

## ARTICLE 21.6.V.2 – REQUIRED SUBMITTALS

a. Proof of ownership or written permission of property owner.

b. Building elevation drawn to scale that identifies:

    i. The façade on which the mural is proposed.
    ii. The location of existing and proposed murals.
    iii. The proposed mural dimensions.
    iv. The height of the mural above grade.
    v. The building eave/cornice and roofline.

**c.** General ~~drawing~~ **sketch** and written description of the type of mural (painted, mosaic, etc.) **specifically identifying any commercial elements. This requirement shall solely serve to allow the City to determine whether the proposal is more properly permitted as a sign, as defined in Article 26 of the Comprehensive Zoning Ordinance. The Department of Safety and Permits shall make this determination within 15 days of submittal.**

d. If the mural is not painted directly on a wall surface, details showing how the mural is affixed to the wall surface.

## ARTICLE 21.6.V.3 – STANDARDS

a. Murals are considered public art. Murals are not permitted to advertise any product, service or brand. No off-premise advertising is permitted. Non-commercial messages are permitted.

b. Mural areas will not be painted on or obscure architectural features such as windows, doors (other than egress-only), pilasters, cornices, signs required by the City Code, or other building trim, feature bands, and other recessed or projecting features.

c. Murals with any element that weighs more than seven (7) pounds per square foot, or in total weighs more than four-hundred (400) pounds require structural review and approval from the Director of the Department of Safety and Permits.

d. Building owners are responsible for ensuring that a permitted mural is maintained in good condition and is repaired in the case of vandalism or accidental destruction.

e. Muralists and building owners are encouraged to use protective clear top coatings, cleanable surfaces, and/or other measures that will discourage vandalism or facilitate easier and cheaper repair of the mural if needed.

Contending that the constitutionality of the City's murals-permit scheme is ripe for this Court's review, the plaintiff now moves for summary judgment on his requests for declaratory and injunctive relief. The challenged law, the plaintiff contends, violates the First and Fourteenth Amendments to the U.S. Constitution because it equates to a prior restraint and a content-based restriction of speech, and because it offers little guidance as to the distinction between a "sign" and a "mural," which are treated separately in the ordinance.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2).  "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted).  Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate.  Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th

10

Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

II.

*A.*

Morris claims that the City's murals-permit scheme violates the First Amendment as (1) a content-based regulation of expression and (2) a prior restraint of speech. Although he alleges that the scheme is unconstitutional both facially and as applied to him, it is undisputed that the City amended its mural regulations following the events giving rise to this lawsuit. Therefore, Morris asserts a facial challenge to the ordinance. To prevail on a facial challenge in the First Amendment context, as here, Morris must demonstrate that: (1) "no set of circumstances exists under which the [challenged ordinance] would be valid," or (2) "a substantial number of its applications are unconstitutional, judged in

relation to the statute's plainly legitimate sweep." <u>United States</u>
<u>v. Stevens</u>, 559 U.S. 460, 473 (2010) (citations omitted).

*B.*

The First Amendment, applicable to the states through the
Fourteenth Amendment, instructs that a state "shall make no law .
. . abridging the freedom of speech[.]" U.S. CONST. amend. I;
XIV. Murals are artwork, which has long been held to be expression
protected by the First Amendment. <u>Hurley v. Irish-American Gay,</u>
<u>Lesbian and Bisexual Group of Boston</u>, 515 U.S. 557, 569, 574
(1995)(noting that "the Constitution looks beyond written or
spoken words as mediums of expression," and that "the . . .
painting of Jackson Pollock, music of Arnold Schoenberg, or
Jabberwocky verse of Lewis Carroll [are] unquestionably shielded"
by the First Amendment); <u>White v. City of Sparks</u>, 500 F.3d 953,
956 (9th Cir. 2007)(holding that plaintiff's "self-expression
through painting constitutes expression protected by the First
Amendment"); <u>ETW Corp. v. Jireh Pub., Inc.</u>, 332 F.3d 915, 924 (6th
Cir. 2003)("The protection of the First Amendment is not limited
to written or spoken words, but includes other mediums of
expression, including music, pictures, films, photographs,
paintings, drawings, engravings, prints, and sculptures."); <u>Bery</u>
<u>v. City of New York</u>, 97 F.3d 689, 695 (2d Cir. 1995)("Visual art
is as wide ranging in its depiction of  ideas, concepts and

emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection.").

First Amendment protections also extend to signs, which are undeniably "a form of expression." City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994). The Supreme Court has recognized that signs pose distinctive problems: "Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." Id. Murals, as works of art housed on exterior surfaces, pose similar problems. As one First Amendment scholar has observed, however, "artwork differs from other forms of speech, particularly signage, in one critical respect: in the case of artwork, the medium is commonly the message." Brian J. Connolly, Reed, Rembrandt, and Wright: Free Speech Considerations in Zoning Regulation of Art and Architecture, 41 No. 11 Zoning and Planning Law Reports NL 1 (Dec. 2018); see also Christina Chloe Orlando, Art or Signage?: The Regulation of Outdoor Murals and the First Amendment, 35 Cardozo L. Rev. 867, 869-70 (2013) ("Although mural law is still in its infancy, the convoluted status of the limited case law has led to a war . . . a real fight around the country.") (citations omitted). This case certainly focuses the troublesome constitutional struggle between signage and artworks.[5]

---

[5] The Supreme Court has signaled little patience with content-based distinctions between signs and other forms of public

*C.*

Morris submits that the City's murals-permit scheme is an unconstitutional content-based regulation of speech in three ways; he claims it is content-based on its face, in its purpose, and through its enforcement.

*i.*

To evaluate the constitutionality of a municipal ordinance that regulates a form of expression, a court must first determine the appropriate level of scrutiny to apply. See Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015). "Content-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Id. (citations omitted). The Supreme Court has emphasized that there are two different categories of content-based regulations. See id. at 2227. First, a regulation of speech is "content based" where the law "'on its face' draws distinctions based on the message the speaker conveys." Id. (citations omitted). A facial distinction based on message may be obvious, "defining regulated speech by particular subject matter," or subtle, "defining regulated speech by its function or

_____

expression. See Reed, 135 S. Ct. at 2228 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral.").

purpose." Id. In either case, the regulation "is subject to strict scrutiny regardless of the government's benign motive or content-neutral justification." Id. at 2228.[6] Alternatively, a content-based regulation exists where a statute is facially neutral but "cannot be 'justified without reference to the content of the regulated speech,' or [was] adopted by the government 'because of disagreement with the message [the speech] conveys.'" Id. at 2227 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Accordingly, "strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." Id. at 2228.

Regulations of commercial speech, which Supreme Court jurisprudence defines as "speech proposing a commercial transaction," are superficially subjected to another level of scrutiny. Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 562 (1980). Under Central Hudson, a regulation of commercial speech is constitutional if: (1) "the asserted governmental interest is substantial;" (2) "the regulation directly advances the governmental interest asserted;"

---

[6] "'The vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.'" Id. at 1229 (quoting Hill v. Colorado, 530 U.S. 703, 743 (2000) (Scalia, J., dissenting)).

and (3) the regulation "is not more extensive than is necessary to serve that interest." Id. at 566.[7]

<em>ii.</em>

Morris contends that the murals-permit scheme is an unconstitutional content-based regulation of speech in three ways: (1) "murals" are regulated differently from "signs" based on their content; (2) murals are explicitly subject to content review; and (3) the City improperly selectively enforces the permit requirement, citing only those murals about which it has received complaints. The City counters that the scheme is a content-neutral regulation of speech that satisfies the time, place, and manner test; the City maintains that: (1) it has the right to treat commercial speech (signage) differently than non-commercial artwork (murals); and (2) it only reviews content to confirm that a proposed mural does not contain commercial speech.

The plaintiff first submits that the murals-permit scheme is content-based on its face in that it regulates murals *because* of their communicative content – artwork that does not contain commercial speech. Invoking Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015), Morris contends that this is a facial distinction that violates recent Supreme Court jurisprudence. Reed hints at some Supreme Court support, although it dealt with signs only.

---

[7] Any attempt to differentiate or reconcile Reed and Central Hudson seems a baffling effort to resolve platitudes.

In <u>Reed</u>, the Supreme Court held that a town sign code was
facially content-based because the manner in which residents could
display outdoor signs depended on their varying forms of
communicative content. 135 S. Ct. at 2230. Subjecting 23
categories of signs to different size, location, and durational
regulations, the sign code treated "ideological signs" most
favorably and imposed more stringent requirements on "temporary
directional signs." <u>Id.</u> at 2224. When a local church posted signs
for Sunday services beyond the time limit for "temporary
directional signs," town officials issued repeated citations, and
the church filed suit. <u>Id.</u> at 2255-26. Finding that the sign
code "single[d] out specific subject matter for differential
treatment," the Court determined that the regulations were
facially content-based and subject to strict scrutiny review, even
though they did not discriminate among viewpoints within that
subject matter. <u>Id.</u> at 2230-31. Ultimately, because the town
could not demonstrate that its content-based distinctions were
narrowly tailored to serve its asserted interests in, for example,
aesthetics or traffic safety, the Supreme Court found the code
violated the First Amendment. <u>Id.</u>

According to Morris, a comparison of the CZO's definitions of
"mural" and "sign" makes clear that the City of New Orleans, like
the Town of Gilbert, subjects public messages to different

regulatory frameworks based on their content.  Section 26.6 of the CZO defines "mural" and "sign" as follows:

> **Mural.** A work of art painted or otherwise applied to or affixed to an exterior surface that does not include any on- or off-premise commercial advertising or does not otherwise meet the definition of a sign as set forth in Article 26 of the Comprehensive Zoning Ordinance.

> **Sign**. Any structure, display, device, or inscription which is located upon, attached to, or painted or represented on any land, structure, on the outside or inside of a window, or on an awning, canopy, marquee, or similar structure, and which proposes a commercial or economic transaction through advertisement; promotion; the direction of attention to any commercial establishment, product, service, industry, business, profession, enterprise, or activity for a commercial purpose; or proposes such a transaction through other means.

If a display affixed to an exterior surface contains a non-commercial message in the form of artwork, it is categorized as a "mural" and subject to the regulations set forth in CZO § 21.6.V, but if the display conveys a commercial message, it is considered a "sign" and regulated under Article 24.  Because a zoning official must review the content of a wall display to conclude that it constitutes artwork and does not contain commercial speech, Morris insists that the murals-permit scheme is a content-based regulation that must satisfy strict scrutiny to survive.

The City counters that its regulatory scheme does not trigger strict scrutiny review.  It seeks only to regulate murals for one distinct purpose – to determine whether a proposed mural requires

a sign permit.  Because the content review stops once an applicant provides information establishing that the proposed mural does not contain commercial speech, and because commercial speech enjoys lesser constitutional protection, the City maintains that its effort to differentiate between commercial and non-commercial speech does not run afoul of Reed.[8]

*iii.*

In contending that the murals-permit scheme is a facially content-based regulation, Morris submits that the ordinance creates two impermissible content-based distinctions: (1) non-commercial messages in the form of artwork versus non-commercial messages in any other form; and (2) artwork that contains commercial speech versus artwork that does not contain commercial speech.

First, Morris contends that the murals-permit scheme singles out for regulation artwork, as opposed to any other type of non-commercial message, by defining "mural" as a "**work of art** painted or otherwise applied to or affixed to an exterior surface that does not include any on- or off-premise commercial advertising . . . " (emphasis added).  During discovery, the plaintiff seemingly

---

[8] Reed itself counters the City's argument.  See Reed, 135 S. Ct. at 2229 ("Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech.").

exposed an example of the content-based nature of the murals-permit application process. In early 2016, an applicant who sought to install a mural called "The Life of Litter" was denied a mural permit on the ground that the proposal constituted an informational display, rather than a "work of art," and therefore required a sign permit. Although this occurred before the recent CZO amendments, Morris submits that the current law features a similarly problematic structure. Because the CZO now defines "mural" as a work of art affixed to an exterior surface that does not contain commercial speech, a zoning official must nevertheless review the content of a wall display to determine whether it qualifies as a "work of art."

The Court notes that another court in this Circuit recently rejected a similar argument in declining to find a sign code to be content based:

> Here, Reagan and Lamar argue that if a viewer must "read the sign . . . just to determine what rules apply, then the regulation is content based under Reed." They submit that the City of Austin Sign Code is content based because the regulations "require the City to look at the content of the sign to determine whether it is an on-premise or off-premise sign," to see if digital sign-faces are permitted. They argue that "the location of the structure itself is not what determines what rules apply. Rather, the content of the sign determines what rules apply." "Does the content advertise something at that location? If so, then the on-premise rules apply. Does th[e] content advertise something not at that location? If so, then the off-premise rules apply."

> Reagan and Lamar are urging an interpretation of
> Reed that no court in this circuit has adopted. On their
> reading, regulations governing stop signs are content
> based because they must be read to determine its
> governing provision under the Sign Code. On this view,
> regulations imposing greater restrictions for commercial
> signs—a well-established and constitutional practice—
> would be content-based because a viewer must read a sign
> to determine if the message was commercial or non-
> commercial. In effect, Reagan and Lamar urge a rule
> that would apply strict scrutiny to all regulations for
> signs with written text.

Reagan Nat'l Advert. of Austin, Inc. v. City of Austin, No. 17-673-RP, 2019 WL 1375574, at *7 (W.D. Tex. Mar. 27, 2019). The Court finds the reasoning of the Western District of Texas doctrinally interesting. But not persuasive, or determinative, for several reasons.

The murals-permit scheme also separates out commercial and non-commercial speech. This distinction is undeniably one that is "content-based;" however, the Supreme Court has long recognized that commercial speech is accorded "a lesser protection" than "other constitutionally guaranteed expression." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 562-63 (1980); see also Mass. Ass'n of Private Career Sch. v. Healey, 159 F. Supp. 3d 173, 193 (D. Mass. 2016) ("The Supreme Court has clearly made a distinction between commercial speech and noncommercial speech . . . and nothing in its recent opinions, including Reed, even comes close to suggesting that well-established distinction is no longer valid") (quoting CTIA-

The Wireless Ass'n v. City of Berkeley, 139 F. Supp. 3d 1048, 1061 (N.D. Cal. 2015)); Peterson v. Vill. of Downers Grove, 150 F. Supp. 3d 910, 927-928 (N.D. Ill. 2015) ("[T]he [Reed] majority never specifically addressed commercial speech . . . because . . . the restrictions at issue in Reed applied only to *non*-commercial speech . . . . [A]bsent an express overruling of Central Hudson, which most certainly did not happen in Reed, lower courts must consider Central Hudson and its progeny . . . binding.") (emphasis in original). But the discussion continues, and the point-counterpoint between Reed and Central Hudson is a mere distraction.

Because § 21.6.V indirectly regulates commercial speech in that it bans commercial messages in murals, the murals-permit scheme certainly remains subject to review under Central Hudson. Before installing a non-commercial work of art on an exterior surface, a building owner or artist must obtain a mural permit; to do so, he must pay a $50 fee and submit proof of the owner's permission, information about where and how the mural will be affixed, a written description identifying any commercial elements, and a general sketch of the proposed mural to confirm that it does not contain commercial speech. See CZO § 21.6.V. However, where a work of art conveys a *commercial* message, a building owner or artist must obtain a sign permit; this also involves paying a fee and providing a written description of the

22

proposed work and the proposed text of the sign.  Unlike murals,
signs are also subject to size restrictions.  See CZO § 24.11.F.

Central Hudson instructs that to sustain a restriction on
commercial speech, the City must demonstrate that: (1) "the
asserted governmental interest is substantial;" (2) "the
regulation directly advances the governmental interest asserted;"
and (3) the regulation "is not more extensive than is necessary to
serve that interest."  Central Hudson, 447 U.S. at 566.  Although
the burden of justifying a regulation of commercial speech is less
onerous than that for a content-based regulation of non-commercial
speech, the hurdle "is not satisfied by mere speculation or
conjecture."  See Edenfield v. Fane, 507 U.S. 761, 770-71 (1993).
To the contrary, "a governmental body seeking to sustain a
restriction on commercial speech must demonstrate that the harms
it recites are real and that its restriction will in fact alleviate
them to a material degree."  Id.

Here, the City asserts that it regulates murals only to
regulate commercial speech and that "a mural permitting process is
necessary to effectively regulate commercial signage."  In blindly
intoning this civic interest, the City fails to indicate how the
differential regulation of commercial and non-commercial artwork
advances any substantial governmental interest, such as traffic
safety or community aesthetics.  In other words, the regulation of
commercial signage appears to be a means to an end that the City

has not identified. Insofar as that purpose is related to community aesthetics, there is nothing in the record to suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork.

Because the City of necessity must determine whether a mural contains commercial speech, and, therefore, should be regulated as a sign, the ordinance is a prohibited free speech enemy and does not pass strict scrutiny, or even a more relaxed scrutiny test. The murals-permit scheme is unconstitutional insofar as it distinguishes between commercial and non-commercial artwork. Regulations of commercial speech (such as signs) are not subject to strict scrutiny. But the City has gone beyond signage regulation.[9]

---

[9] Indeed, if the City is concerned about murals that incite public disorder, the City has other well-known police powers to address that.

Although the Court appreciates that a permit requirement for murals may allow a municipality to keep track of what is and is not graffiti, which in turn, could advance a governmental interest in aesthetics, the summary judgment record seriously casts doubt on the legitimacy of the City's interest in keeping track of graffiti. Notably, the City has readily admitted, fatal selective enforcement, including under oath, that it takes no proactive action against unpermitted murals and only responds to complaints. As the City's Department of Safety and Permits Director, Jared Munster, attests in his affidavit: "In the vast majority of violation cases, mural or otherwise, the Department of Safety and Permits is a responsive agency rather than proactive." Jennifer Cecil, the purported director of the City's "One Stop for Permits and Licenses," similarly testified during her deposition that the City takes no enforcement action until it receives a complaint:

III.

Morris also seeks summary relief in his favor that the murals-permit scheme is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment. In particular, he requests a declaration that the definition of "mural," located in CZO § 26.6, is void for vagueness. The City responds that the challenged text is sufficiently clear to give people of ordinary intelligence fair notice of what constitutes a mural.

The Fourteenth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. XIV. "Vagueness doctrine is an outgrowth of the Due Process Clause." <u>United States v. Williams</u>, 553 U.S. 285, 304 (2008). The Supreme Court has

---

**Q:** You are saying you are aware of murals that don't have permits for which no enforcement action has been taken?
**A:** Yes.

**Q:** Okay.
**A:** Those murals have not been the subject of complaints or inquiries.

**Q:** Okay. So if you are aware of murals that do not have permits but no one has complained, you take no enforcement action?
**A:** I would say, yes, that is correct.

In light of the City's admission that it only enforces the permit requirement against murals about which it receives complaints, it is questionable as to whether the murals-permit scheme promotes aesthetics in any meaningful way.

consistently held that "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289-90 (1982) (citing Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)); see also Johnson v. United States, 135 S. Ct. 2551, 2557-58 (2015); Kolender v. Lawson, 461 U.S. 352, 357 (1983); Munn v. City of Ocean Springs, Miss., 763 F.3d 437, 439 (5th Cir. 2014) ("The Due Process Clause requires that a law provide sufficient guidance such that a man of ordinary intelligence would understand what conduct is being prohibited.").[10]

Morris challenges as impermissibly vague two components of the definition of "mural:" (1) "work of art," and (2) "exterior surface." Morris first submits that, because the CZO does not define "work of art," permit applicants are required to determine for themselves whether paint applied to an exterior surface is "art." Pointing to the deposition testimony of Jennifer Cecil,

---

[10] The Supreme Court has also suggested that a law violates due process where its standards are "too vague to support the denial of an application for a license." See City of Mesquite, 455 U.S. at 293 ("We may assume that the definition of 'connections with criminal elements' in the city's ordinance is so vague that a defendant could not be convicted of the offense of having such a connection; we may even assume, without deciding, that such a standard is also too vague to support the denial of an application for a license to operate an amusement center.").

Director of the New Orleans One Stop for Permits and Licenses, Morris notes that Ms. Cecil herself could not even define the term:

> **A:** . . . the presentation of a permit request for a mural is an assertion that this is a work of art . . . .
>
> **Q:** So you are saying that the applicant, by the mere fact of asking for a mural permit, is presuming that the subject is a work of art?
> **A:** That's my understanding of how it's approached, yes.
>                                  . . .
>
> **Q:** So that's what I am sort of getting at.  I am trying to understand where the line is drawn.
> **A:** If you tell me that it's not a work of art when you come in, that you are just painting solid -- that you are painting a house, there will be no permit required if you are not in a historic district.
>
> **Q:** So if I don't think it's a work of art, I don't need a permit?
> **A:** If you don't think it is a work of art and you are describing solid color painting to us, we would not tell you that, no.  If you begin describing figurative painting or painting of words, we would suggest that you have it reviewed and you present an example of what that would look like.

Tellingly, the City fails to respond to the plaintiff's arguments in this regard.  In so doing, the City apparently concedes that the CZO's failure to define "work of art" renders the definition of "mural" impermissibly vague.[11]

_____

[11] Of course, if the City were to attempt to define "work of art," this would unquestionably give rise to additional content-based distinctions.  It appears the City has no choice but to step back and craft a broad, content neutral definition of sign that does not refer to "art," "commercial speech," or "non-commercial speech."  And if the City wishes to treat murals differently than signs, it could perhaps create subcategories based on physical

Morris also correctly contends that the meaning of "painted or otherwise applied to or affixed to an **exterior surface**" is vague and unclear. For instance, he questions whether an "exterior surface" includes a roof that is not visible to passerby, or a wall of a penthouse atop a skyscraper. (Or, if maybe one wishes to use two colors to paint an "exterior surface," he will have created a mural.) He also queries whether the mural permit requirement only applies to particular types of structure. To demonstrate that the meaning of "exterior surface" is open to interpretation, Morris again spotlights Ms. Cecil's deposition testimony:

> **Q:** . . . I want to paint a mural on the wall of [my] courtyard. It's an exterior wall, but it's not public facing.
> . . .
> **A:** . . . I believe as it is written, you should [obtain a mural permit], but we may never come to know that such a painting exists without having reason to visit the interior courtyard space you have hypothetically referred to.
>
> **Q:** Right. So the question is really more specific. Is that wall considered an exterior wall?

---

characteristics alone, such as "wall sign" or "painted wall sign." Compare Central Radio Co. Inc. v. City of Norfolk, Va., 811 F.3d 625, 628-29 (4th Cir. 2016) (holding that sign ordinance exempting from regulation "works of art which in no way identify or specifically relate to a product or service" was a "content-based regulation that d[id] not survive strict scrutiny") with Peterson v. Vill. of Downers Grove, 150 F. Supp. 3d 910, 919-23 (N.D. Ill. 2015) (holding that sign ordinance's ban on all painted wall signs was content neutral and "narrowly tailored to serve the Village's interest in aesthetics.").

**A:** Would you mind if I looked at the definition again?

Because the CZO's use of the indistinct, shapeless, and obscure phrases "work of art" and "exterior surface" fails to provide "sufficient guidance such that a [person] of ordinary intelligence would understand" when a mural permit is required, Morris is entitled to summary judgment that the definition of "mural" is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment. See Munn, 763 F.3d at 439.

IV.

Having determined that the murals-permit scheme is facially unconstitutional, the Court must consider whether to issue an injunction against its enforcement.

"The legal standard for obtaining a permanent injunction mirrors the legal standard for obtaining a preliminary injunction." Viet Anh Vo v. Gee, 301 F. Supp. 3d 661, 664 (E.D. La. 2017) (citing Lionhart v. Foster, 100 F. Supp. 2d 383, 385-386 (E.D. La. 1999)). Thus, "[a] plaintiff must demonstrate '(1) actual success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) the injunction will not disserve the public interest.'" Id. (quoting Causeway Med. Suite v. Foster, 43 F. Supp. 2d 604, 610 (E.D. La. 1999)). The notable distinction between the legal standards for preliminary and permanent

injunctive relief is that the plaintiff must demonstrate actual success on the merits, rather than a likelihood of success. Id. (citing Lionhart, 100 F. Supp. 2d at 386).

After considering the factors governing issuance of injunctive relief, the Court finds that an injunction is warranted. As for the danger of not granting injunctive relief, the Fifth Circuit has consistently held that the loss of First Amendment freedoms constitutes irreparable injury. See Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 506 (5th Cir. 2009) (internal citations omitted). Balanced against this grave threat is the City's irresolute interest in identifying those commercial messages that may be masquerading as murals. Finally, an injunction will not disserve the public interest because "injunctions protecting First Amendment freedoms are always in the public interest." Texans for Free Enter. v. Tex. Ethics Comm'n, 732 F.3d 535, 539 (5th Cir. 2013) (internal citations omitted).

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's motion for summary judgment is hereby GRANTED. IT IS FURTHER ORDERED: that New Orleans Comprehensive Zoning Ordinance § 21.6.V is hereby declared facially unconstitutional and that the City of New Orleans is enjoined from enforcing § 21.6.V.

New Orleans, Louisiana, July 9, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE